Smaller Manufacturers Council, a Pennsylvania non-profit corporation; Hanlon-Gregory Industries, a Pennsylvania corporation; Pittsburgh Commercial Heat Treating Co., a Pennsylvania corporation; and Braunlich-Roessle Company, a Pennsylvania corporation and Greater Pittsburgh Chamber of Commerce, a Pennsylvania non-profit corporation v. Council of the City of Pittsburgh and The City of Pittsburgh and Support Our Neighborhoods Action Coalition, a Pennsylvania unincorporated association and Allegheny County Labor Council, a Pennsylvania unincorporated association.

Support Our Neighborhoods Action Coalition and The Allegheny County Labor Council, Appellants.

534

Argued March 13, 1984, before President Judge CRUMLISH, JR. and Judges ROGERS, WILLIAMS, JR., CRAIG, MACPHAIL, BARRY and COLINS.

*Jon Pushinsky,* with him, *D. R. Pellegrini,* for appellants.

*James B. Brown,* with him, *David F. Toal, Baskin and Sears, P.C.,* for appellees, Smaller Manufacturers Council, Hanlon-Gregory Industries, Pittsburgh Commercial Heat Treating Company, and Braunlich-Roessle Company.

*David L. McClenahan,* with him, *Stephen M. Olson* and *Carolyn L. Marchetti, Kirkpatrick, Lockhart, Johnson & Hutchison,* for appellee, Greater Pittsburgh Chamber of Commerce.

*Jacques M. Wood,* with him, *Stephen C. Kunkle, Berkman, Ruslander, Pohl, Lieber & Engel,* for Amicus Curiae, Tristate Industrial Association, Inc.

*Harold I. Goodman,* with him, *Lorrie McKinley,* for Amici Curiae, The Philadelphia Unemployment Project and The Delaware Valley Coalition for Jobs.

*Michael R. Feinberg,* for Amicus Curiae, Economic Rights Taskforce of the National Lawyers Guild.

OPINION BY JUDGE BARRY, October 24, 1984:

This appeal results from an order of the Court of Common Pleas of Allegheny County which invalidated Ordinance 21 passed by the Council of the City of Pittsburgh (City). Subsequent to the passage of Ordinance 21, the solicitor for the City filed a petition for declaratory judgment to test the validity of the ordinance. Appellees, Smaller Manufacturers Council, a Pennsylvania non-profit corporation, Hanlon-Gregory Industries, a Pennsylvania corporation, Pittsburgh Commercial Heat Treating Co., a Pennsylvania corporation, Braunlich-Roessle Company, a Pennsylvania corporation and the Greater Pittsburgh Chamber of Commerce, filed petitions to intervene in order that they might file petitions for declaratory judgment challenging the validity of the ordinance. Appellants, the City of Pittsburgh and its city council were joined by intervenors Support Our Neighborhoods Action Coalition, The Allegheny County Labor Council, the Philadelphia Unemployment Project and Delaware Valley Coalition for Jobs. An en banc panel of the Court of Common Pleas of Allegheny County held that Ordinance 21 was invalid for three reasons. The court held that (1) the City lacked the authority to enact the ordinance, (2) the ordinance was preempted by

federal labor law and (3) the ordinance contained a void penalty provision. This appeal followed.

Ordinance 21 was adopted for the stated purpose of reducing the economic disruption caused by plant closings and relocations in the Pittsburgh area. The ordinance requires an employer, when a plant closes, relocates or reduces its operations so that there is a loss of employment of 15% of employees, to notify in writing a Bureau of Business Security created under the terms of the ordinance.[1] The notice required is as follows:

(1) Employers of 50-100 employees shall give 90 days prior notification;

(2) Employers of 101-500 employees shall give 180 days prior notification; and,

(3) Employers of 501 or more shall give 270 days prior notification.[2]

The Bureau has the right to determine a proper notice that is less than that required under the ordinance. Section 5(B) also provides "the Bureau shall develop written criteria for such determinations" (a salutary provision which does not delegate absolute power to the Bureau).

Section 5(C) relating to what is required to be included in the written notice, Section 6 "Investigation", Section 7 "Report of Investigation", Section 8 "Duties of the Bureau" and Section 9 "Exclusions" are attached to this opinion as an appendix. Section 11 of the ordinance creates a Commission for Jobs and Com-

---

[1] Section 4 of the ordinance is headed Creation of the Bureau of Employee Protection rather than the Bureau of Business Security. Apparently there was a failure to change the heading which was in a prior draft of the ordinance.

[2] Section 5(B) talks about waiver of "one year's advance notice". Apparently the one year's notice also is an error which was not deleted from the present draft of the ordinance.

merce to advise City Council on the actions and decisions of the Bureau.

As previously mentioned, the trial court invalidated the ordinance on three distinct grounds. First, the court held that the ordinance violated Section 302(d) of the Home Rule and Optional Plans Law.[3] Second, the court held that the ordinance was preempted by federal labor law. Finally, the court ruled that the ordinance contained a void penalty provision. We will discuss the court's rulings in reverse order.

The trial court was correct when it found that the penalty provision in Section 10(B) of the ordinance was void as it was contrary to Section 302(a)(9) of the Home Rule and Optional Plans Law, 53 P.S. §1-302(a)(9) which provides:

(a) The home rule charter adopted in accordance with the provisions of this Act shall not give any power or authority to the municipality contrary to, or in limitation of powers granted by acts of the General Assembly which are applicable to a class or classes of municipalities on the following subjects:

. . . .

(9) defining or providing for the punishment of any felony or misdemeanor.

As Section 10(B) of the ordinance makes it a misdemeanor to fail to comply with various of the provisions of the ordinance, that provision is obviously void. However, the trial court erred when it held that the entire ordinance was void because there was no severability provision in the ordinance. 1 Pa. C. S. §1925 provides:

The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circum-

---

[3] Act of April 13, 1972, P.L.    , 53 P.S. §1-302(d).

stance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected' thereby, unless the court finds that the valid provisions of the statutes are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

We believe that voiding the penalty provisions of the ordinance in no way invalidates the remainder of the ordinance.

We likewise disagree with the trial court's holding that federal labor law preempts the present ordinance. It is true that some areas of the field of labor management relations are certainly preempted by the National Labor Relations Act, although the federal courts more often than not do not use the term "preemption", but speak in various ways of the primacy of the federal government and the NLRB in certain areas of this complicated field. Surely there is not such a broad preemption that the state courts cannot prohibit mass picketing, enjoin violent acts by management or labor or, indeed, listen to the pronouncements of the Pennsylvania Labor Relations Board. We believe that Ordinance 21 addresses peripheral concerns that are not directly involved in labor-management relations, and hence within the exclusive sphere of the federal government's responsibility. The City has a proper concern for the failure of businesses, the loss of jobs and the deterioration of neighborhoods, concerns about

which, we believe, it can legitimately legislate if it is not otherwise prohibited by *state law* from doing so. To hold otherwise would be to look askance at plant closing laws in four other states[4] and to telegraph to our General Assembly that it has no power to adopt a state plant closing law that presently is the subject of hearings throughout the Commonwealth. We believe that Justice FRANKFURTER in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 241, (1959), uses language which is particularly applicable to this case, and which indicates that there is not a general preemption in this area.

In determining the extent to which state regulation must yield to subordinating federal authority, we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration. The nature of the judicial process precludes an ad hoc inquiry into the special problems of labor-management relations involved in a particular set of occurrences in order to ascertain the precise nature and degree of federal-state conflict there involved, and more particularly what exact mischief such a conflict would cause. Nor is it our business to attempt this. Such determinations inevitably depend upon judgments on the impact of these particular conflicts on the entire scheme of federal labor policy and administration. Our task is confined to dealing with classes of situations. To the National Labor Relations Board and to Congress must be left those precise and closely limited demarcations that can be adequately fashioned only by legislation and administration. We have necessarily been concerned with the potential

---

[4] Massachusetts, Connecticut, Maine and Wisconsin.

conflict of two law-enforcing authorities, with the disharmonies inherent in two systems, one federal the other state, of inconsistent standards of substantive law and differing remedial schemes. But the unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience:

Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies.... A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. . . .

Administration is more than a means of regulation; administration is regulation. We have been concerned with conflict in its broadest sense; conflict with a complex and interrelated federal scheme of law, remedy, and administra-

tion. Thus, judicial concern has necessarily focused on the nature of the activities which the States have sought to regulate, rather than on the method of regulation adopted. When the exercise of state power over a particular area of activity threatened interference with the clearly indicated policy of industrial relations, it has been judically necessary to preclude the States from acting. However, due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the Labor Management Relations Act. Or where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act. (Citations omitted.)

We do not believe *First National Maintenance Corp. v. National Labor Relations Board,* 452 U.S. 666 (1981), cited by the appellees, is contrary to the conclusion reached here. That case involved an unfair labor practice charge by a union against a company which alleged violation of its duty to bargain in good faith "with respect to wages, hours, and other terms and conditions of employment" (the specific language of Sections 8(D) and 8(A)(5) of the National Labor Relations Act). As the Supreme Court pointed out in *First National,* the case involved *mandated* bargaining rather than *permitted* bargaining. Here there is no attempt to interefere with the "employer's need

to operate freely in deciding to shut down part of its business purely for economic reasons''. *Id.* at 686.

In any event, the trial court, having reached a conclusion that the whole area was preempted, did not go into specifics about the ordinance which, we believe, may or may not be inimical to the provisions of the National Labor Relations Act. If the questions of preemption were the sole one in this case we would remand for further findings of fact on this issue.

Nonetheless, we believe the ordinance must fall because it is violative of the limitations imposed by Section 302(d) of the Home Rule and Optional Plans Law which provides:

> (d) No municipality which adopts a home rule charter shall at any time thereunder determine the *duties, responsibilities or requirements* placed upon *businesses,* occupations and *employers,* including the duty to withhold, remit or report taxes or penalties levied or imposed upon them or upon persons in their employment, except as *expressly provided by the acts of the General Assembly* which are applicable in every part of the Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities. (Emphasis added.)

We believe it is clear that the trial court correctly concluded that the ordinance flies in the face of the express language of this section of the Home Rule and Optional Plans Law. Therefore, if the City wishes to act in this area it must be empowered to do so by the General Assembly.

Order affirmed.

ORDER

Now, October 24, 1984, the order of the Court of Common Pleas of Allegheny County, dated August 19, 1983, at No. GD83-11245, is affirmed.

CONCURRING OPINION BY JUDGE COLINS:

I concur in the result reached by the majority of the Court. However, I must differ with the majority's interpretation of the applicable Federal case law and agree with the Common Pleas Court's holding that the area is preempted by Federal labor law.

In 1947 the United States Congress passed the Labor Management Relations (Taft-Hartley) Act, 29 USCA §§141-197. The Taft-Hartley Act substantially amended the National Labor Relations (Wagner) Act of 1935, Act of July 5, 1935, 49 Stat. at L. 449, Chap. 372.4. These two pieces of legislation evidence a clear congressional intent to develop a national labor policy administered by the National Labor Relations Board.

In doing so, Congress sought to eliminate interference from local governments in negotiations and relations between employers and employees represented by labor organizations. In reiterating this doctrine, the United States Supreme Court has stated that:

Congress . . . went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal . . . . Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid those diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.

Garner v. Teamsters Union, 346 U.S. 485, 490 (1953).

In First National Maintenance Corp. v. National Labor Relations Board, 452 U.S. 666 (1981) the United States Supreme Court unequivocally stated that negotiations over plant closings were clearly within the scope of the National Labor Relations Act. In dis-

cussing plant closings for economic reasons, the Court stated that while the employers had no duty to negotiate the actual decision to close a plant, they did have a duty to notify their employees and their representatives and meet with them to discuss the effects of a plant closing.

It has been consistently ruled that Section 8(a) (5) of the Taft-Hartley Act requires employers to give the employees reasonable notice of an intended plant shutdown.

By requiring mandatory meetings between employers and unions for the purpose of discussing plant closings, Ordinance No. 21 converts a voluntary subject of bargaining into a mandatory subject. This is clearly proscribed by the holding in *First National Maintenance Corp.*

Whether or not an activity is specifically allowed or forbidden by the National Labor Relations Board is not the controlling factor in determining preemption. Rather, it is whether the area is arguably within the purview of the Board's jurisdiction that controls. In discussing the question of the NLRB preemption of state regulation, Mr. Justice FRANKFURTER declared that:

> At times it has not been clear whether the particular activity regulated by the States was governed by §7 or §8 or was perhaps outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this court's authority cannot remain within a state's power and state's jurisdiction to must yield to the exclusive primary competence of the Board.

*San Diego Building Trades Council v. Garmon,* 359
U.S. 236, 244 (1959).

I would affirm Judge NARICK's opinion, writing for
the Common Pleas Court en banc, insofar as it holds
that state and municipal authorities are preempted
from regulating the areas which Ordinance 21 seeks
to control.

APPENDIX

Section 5.

(C)  The written notice required by subsection (a)
shall include the following:

(1)  The nature of the establishment affected
by the closing, relocation or reduction of opera-
tions;

(2)  The reasons for the proposed closing, relo-
cations or reduction in operations.

(3)  An economic impact statement which shall
include information concerning the:

(a)  Employer's payroll.

(b)  The name, address of all employees to
be affected by the proposed action.

(c)  Wages and other remuneration paid to
those employees.

(d)  Amount of local tax revenue that will
be lost as a result of the proposed action.

(e)  Potential financial effect on other busi-
ness in the affected community.

(f)  Any plans the employer has developed
to relieve the adverse effects of the proposed
action on the affected employees and commu-
nity.

(g)  The economic circumstances of the em-
ployer and affected establishment including
present profitability or marginality and future
investment, employment and production plans
for that establishment and similar establish-

ments owned or controlled by the employer. The feasibility of transferring affected employees to other establishments of the employer.

(h) Potential alternatives to the proposed action.

(i) Any plans the employer might have to sell the establishment, including a statement as to whether the employees have been given first right of refusal to buy and operate the establishment.

Section 6. Investigation

(A) Within (30) days for a type 1 employer (as described in Section 3(A), (60) days for a type 2 employer, and (90) days for a type 3 employer, of receipt of notice of intention to close, relocate or reduce operations, the Bureau shall conduct a thorough investigation and make confidential findings regarding all of the following:

(1) The economic necessity or justification for the action.

(2) The potential economic and social loss to the affected employees and the City of Pittsburgh.

(3) Potential alternatives to the proposed action.

(4) The accuracy of the economic impact statement submitted by the employer.

(5) The recommendations of any authorized representative of: any affected labor organization at such establishment; any affected unit of local government; any employee-community organization; and any other interested party.

(6) The feasibility of preventing or minimizing such employment loss by the modification of product lines and production techniques at such establishment.

(B)   The employer shall provide to the Bureau any additional information requested by the Bureau necessary to its investigation.

Section 7.   Report of Investigation

(A)   After the investigation is concluded, the Bureau shall prepare a report containing the findings with respect to the matters described in Section 6, for presentation to the Commission, and make recommendations regarding actions required to be taken in order to prevent or minimize the harmful economic and social effects which will result from the change of operations at the affected establishment.

(B)   The report shall include, when appropriate:

(1) recommendations regarding the availability of new financing;

(2)   re-organization of management and production operations;

(3)   new markets for goods and services supplied by the employer; and

(4)   the feasibility of employee, community ownership, including public ownership.

Section 8.   Duties of the Bureau

(A)   If it is determined under Section 7 of this Ordinance that an employee-owned or community-owned business is economically feasible and that a majority of the affected employees desire to operate an employee-owned business, the Bureau upon request shall:

(1)   Provide technical assistance to persons who seek to form an employee-owned business;

(2)   Assist persons to obtain financing for the purchase and operation of an employee-owned business; and

(3)   Coordinate the efforts of local, state and federal and private agencies assisting in the formation or operation of an employee-owned business.

(B) If within thirty (30) days after receipt of the report specified in Section 7, the employer does not agree to adopt a recommended alternative to the reduction in operations, the Bureau shall do the following:

(1) Convene a meeting of representatives from the following:

(a) The ownership and management of the business operation.

(b) The affected employees organizations or, if there are no such organizations, specially elected representatives of those employees.

(c) The neighborhood organization in which the affected work place is located.

(d) The principal financial institutions in the community.

(e) The City of Pittsburgh.

(f) Any public agencies considered appropriate by the Bureau.

(2) Direct the individuals attending the meeting convened under paragraph (1) to prepare a plan which will prevent, to the extent possible, unemployment from occurring as a result of the reduction in operations, and will minimize economic disruption in the affected community and in the lives of affected employees.

Section 9. Exclusions

(A) This Ordinance does not apply to:

(1) An involuntary closing of an establishment;

(2) An employer who has filed for bankruptcy in accordance with federal bankruptcy laws;

(3) The discharge of employees due to strikes and lockouts; and

(4) New corporation, industrial commercial and business enterprise from outside the City

will be exempt from the provisions of this Ordinance for a period of five (5) years.

(B)   This Ordinance does not affect the right of employees to longer notice as specified in a collective bargaining agreement.