Gerry HARTMAN, John Lapinski, Robert Roycroft and Debbie Roycroft

v.

CITY OF ALLENTOWN and City of Harrisburg, Appeal of City of Allentown.

Commonwealth Court of Pennsylvania.

Argued April 7, 2005.

Decided Aug. 11, 2005.

Thomas B. Schmidt, III, Harrisburg, for appellant, City of Allentown.

Randall L. Wenger, Lancaster, for appellees, Gerry Hartman, John Lapinski, Robert Roycroft and Debbie Roycroft.

Elisabeth S. Shuster, Harrisburg, for amicus curiae, Pennsylvania Human Relations Commission.

BEFORE: COHN JUBELIRER, Judge, SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

The City of Allentown (Allentown) appeals an Order of the Court of Common Pleas of Lehigh County that granted a motion for judgment on the pleadings, and declared Allentown Ordinance No. 13964 (Ordinance) invalid and unenforceable. The trial court held that the Ordinance, by permitting Allentown to place duties, responsibilities or requirements upon businesses, occupations and employers, violated Section 2962(f) of the Home Rule Charter and Optional Plans Law (Home Rule Law).[1] On appeal, Allentown argues that the trial court erred in reading Section 2962(f) of the Home Rule Law too broadly, and that Allentown's police powers provide authority for it to enact local anti-discrimination ordinances that prohibit discrimination for reasons in addition to those specifically listed in the Pennsylvania Human Relations Act (PHRA).[2]

Before choosing, by referendum, to be governed by Home Rule and adopting a Home Rule Charter on April 23, 1996, Allentown had been governed by a charter under the Optional Third Class City Charter Law.[3] In 1966, while governed by The Third Class City Code,[4] Allentown enacted a Human Relations Ordinance, codified as Article 181, establishing the Allentown Human Relations Commission (Commission). Article 181 made it unlawful to discriminate in employment and housing based on categories that track those listed in the PHRA,[5] and authorized the Commission to

1. 53 Pa.C.S. § 2962(f).

2. Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §§ 951–963.

3. Act of July 15, 1957, P.L. 901, *as amended,* 53 P.S. §§ 41101–41625.

4. Act of June 23, 1931, P.L. 932, *as amended,* 53 P.S. §§ 35101–39701.

5. The following classes of people are protected under the PHRA:

 groups by reason of their race, color, familial status, religious creed, ancestry, age,

initiate, receive and investigate complaints of discrimination in employment, housing and public accommodations.

On March 20, 2002, Allentown adopted the Ordinance at issue which amended Article 181 to add "sexual orientation"[6] and "gender identity"[7] as prohibited bases of discrimination in employment, housing and public accommodations. This amended provision now reads that it is unlawful to discriminate in employment and housing based on the following categories:

> [R]ace, color, religion, national origin, ancestry or place of birth, sex, gender identity, sexual orientation, disability, marital status, familial status (in housing only), age or use of a guide or support animal because of blindness, deafness or physical disability of any individual ... or because of the disability of an individual with whom the person is known to have an association.

*See* Codified Ordinances of the City of Allentown, Article 181, § 181.02.

On April 4, 2002, the Ordinance was signed into law by Allentown's Mayor. In response to the passage of the Ordinance, Gary Hartman, John Lapinski, Robert Roycroft and Debbie Roycroft (Appellees), who are owners of rental property and taxpayers, and a business operator, filed suit challenging the Ordinance on two grounds: 1) that the PHRA preempted the Ordinance; and, 2) that the Ordinance was *ultra vires*, because it violated Allentown's

authority under the Home Rule Law.[8] Thereafter, both Appellees and Allentown filed cross-motions for judgment on the pleadings. Following the submission of briefs and oral argument, the trial court, on June 14, 2004, entered a Decree Nisi finding the Ordinance: 1) was not preempted by the PHRA; but, 2) was invalid and unenforceable pursuant to Section 2962(f) of the Home Rule Law.

The trial court, in an articulate and well-researched opinion, held that the PHRA does not preempt municipal legislation expressly or by necessary implication but, rather, provides that "nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance ... relating to discrimination...." 43 P.S. § 962(b). The trial court determined that the "PHRA explicitly disclaims any intention of preempting municipal ordinances relating to discrimination based on any of the identified classifications ... [n]or does the PHRA expressly or by necessary implication prohibit municipal ordinances relating to discrimination based on other classifications, such as sexual orientation or gender identity." (Trial Ct. Op. at 8.) The trial court also found that there was no inherent conflict between the PHRA and the Ordinance and that enforcement of the PHRA would in no way be impeded by Allentown prohibiting additional categories of discrimination.

---

> sex, national origin, handicap or disability, use of guide or support animals because of the blindness, deafness or physical handicap of the user or because the user is a handler or trainer of support or guide animals....
>
> Section 2(a) of the PHRA, 43 P.S. § 952(a).

**6.** "Sexual orientation" is defined as "male or female homosexuality, heterosexuality and bisexuality, by preference, practice or as perceived by others." (Ordinance § 181.02.)

**7.** "Gender identity" is defined as "self-perception, or perception by others, as male or female, including a person's appearance, behavior, or physical characteristics, that may be in accord with, or opposed to, one's physical anatomy, chromosomal sex, or sex assigned at birth." (Ordinance § 181.02.)

**8.** Appellees concede that the Ordinance does not violate the United States or Pennsylvania Constitutions, or contravene any provision of Allentown's Charter.

However, the trial court agreed with Appellees that the Ordinance was *ultra vires*, although for a reason different than Appellees had initially argued. It held that the Ordinance violates Section 2962(f) of the Home Rule Law, which states that a home rule municipality "shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers ... except as expressly provided...." 53 Pa.C.S. § 2962(f). The trial court found that the Ordinance places duties and responsibilities on businesses, occupations and employers and that there is no statute, including the PHRA, which expressly authorizes municipal legislation dealing with discrimination on the basis of sexual orientation or gender identity. Therefore, the trial court held that, to the extent that the Ordinance does so, it is *ultra vires*. (Trial Ct. Op. at 14.)

Allentown filed its exceptions to the Decree Nisi on June 24, 2004. Appellees did not file exceptions. The trial court overruled Allentown's exceptions and entered its Decree Nisi as a final order on July 15, 2004. Allentown filed its Notice of Appeal on August 10, 2004. Appellees did not cross-appeal.[9]

 On appeal, this Court may sustain the trial court's grant of judgment on the pleadings *only* where the moving party's right to succeed is certain and the case is so free from doubt that trial would be a fruitless exercise. *Sch. Sec. Servs., Inc. v. Duquesne City Sch. Dist.*, 851 A.2d 1007, 1011 n. 2 (Pa.Cmwlth.2004), *petition for allowance of appeal denied*, 582 Pa. 690, 870 A.2d 325 (2005). Our scope of review is whether the trial court committed an error of law or abused its discretion. *Id.* We may consider only the pleadings, admissions and any documents properly attached to the pleadings presented by the party *against* whom the motion is filed. *Id.*

## I. Home Rule Law

As a home rule municipality, Allentown derives its legislative power primarily from

---

**9.** *Amici Curiae* filed briefs in support of Allentown. The Pennsylvania Human Relations Commission (PHRC), which is the governmental agency established by the General Assembly for the purpose of interpreting the PHRA, 43 P.S. § 956, argues that the PHRA does not preempt the Ordinance and urges this Court to affirm Allentown's power to adopt local protections against discrimination. Other *Amici* include several Allentown area businesses; many Allentown churches and community groups that oppose discrimination; and, several groups, including a State Representative, who are dedicated to supporting civil rights for all citizens in Allentown and across the Commonwealth. This group of *Amici* submitted a brief to emphasize the importance of preserving the ability of home rule communities to respond to the needs of their citizens and to act as a vanguard for statewide legislation. They urge this Court to allow municipalities like Allentown to respond to the needs of its diverse citizens and to lead the Commonwealth to a safer, freer and more open society. The following are a part of this group: Air Products and Chemicals, Inc., PPL Corp., Stevens and Johnson, Perlis Montessori School, All Together Now, Grace Episcopal Church, Metropolitan Community Church of the Lehigh Valley, University Lutheran Church of the Incarnation, The Right Reverend Paul V. Marshall, AIDS Outreach, Inc., Alliance for Sustainable Communities—Lehigh Valley, Community Action Committee of the Lehigh Valley, Inc., Gay, Lesbian, Straight Education Network, Lehigh–Pocono Committee of Concern, Puerto Rican Cultural Alliance, Turning Point of Lehigh Valley, Valley Free Press, Representative Jennifer L. Mann, American Civil Liberties Union of Pennsylvania, The American Federation of State, County and Municipal Employees—AFL—CIO District Council 47, The American Federation of State, County and Municipal Employees Local 2187, Center for Lesbian and Gay Civil Rights, Parents Family and Friends of Lesbians and Gays, Pennsylvania Gay and Lesbian Alliance, Pennsylvania National Organization for Women, Statewide Pennsylvania Rights Coalition, Student Mobilization Project, and the Women's Law Project.

Section 2961 of the Home Rule Law, which grants expansive authority, and provides for liberal construction of its powers in favor of the municipality:

A municipality which has adopted a home rule charter may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter. All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality.

53 Pa.C.S. § 2961. In addition to the broad, general grant of legislative power in the Home Rule Law, the General Assembly, through specific statutes, has authorized municipalities to legislate on various subjects.[10]

The broad grant of authority in Section 2961 of the Home Rule Law is limited by Section 2962. Section 2962(f) states in pertinent part:

**Regulation of business and employment.**—A municipality which adopts a home rule charter shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers, including the duty to withhold, remit or report taxes or penalties levied or imposed upon them or upon persons in their employment, except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of

municipalities. This subsection shall not be construed as a limitation in fixing rates of taxation on permissible subjects of taxation.

53 Pa.C.S. § 2962(f). In deciding whether the Ordinance is *ultra vires* and, thus, clearly prohibited, we must determine how broadly this limitation on home rule authority should be interpreted, as well as its interplay with Allentown's police powers.

▐ Under the Pennsylvania Constitution, a municipality that has a home rule charter may exercise any power or any function not denied by the Pennsylvania Constitution, by its home rule charter or by the General Assembly at any time. Pa. Const. art. 9, § 2. The Legislature has stated its intention very explicitly in the Home Rule Law that the grant of municipal power to a municipality governed by a home rule charter shall be liberally construed in favor of the municipality. 53 Pa.C.S. 2961. The essential principle underlying home rule is the transfer of authority to control certain municipal affairs from the state to the local level. Jonathan M. Kopcsik, *Constitutional Law—Home Rule and Firearms Regulation: Philadelphia's Failed Assault Weapons Ban—Ortiz v. Commonwealth*, 545 Pa. 279, 681 A.2d 152 (Pa.1996), 70 Temp. L.Rev. 1055 (1997). This transference results in home rule municipalities having *broader powers* of self government than non-home rule municipalities. *Id.*[11]

Allentown argues that it has the power to enact this Ordinance pursuant to its police power, which is its fundamental au-

---

**10.** For example, the PHRA not only established the PHRC, 43 P.S. § 956, but also authorized municipalities to establish local human relations commissions, as Allentown did in 1966, with powers and duties similar to the state commission. 43 P.S. § 962.1.

**11.** Moreover, courts generally agree that municipal regulations more restrictive than state

regulations are not in conflict with the state provisions because any other result would severely restrict municipal autonomy with respect to police power. *See* George D. Vaubel, *Towards Principles of State Restraint Upon the Exercise of Municipal Power in Home Rule,* 24 Stetson L.Rev. 417 (1995).

thority to protect the health, safety and welfare of its citizens. *Taylor v. Harmony Township Bd. of Comm'rs*, 851 A.2d 1020, 1024–25 (Pa.Cmwlth.2004), *petition for allowance of appeal denied*, 863 A.2d 1151 (2004). A municipality's police power enables 'civil society' to respond in an appropriate and effective fashion to changing social, economic and political circumstances, and maintain its vitality and order. *Nat'l Wood Preservers, Inc., v. Dep't of Envtl. Res.*, 489 Pa. 221, 231–32, 414 A.2d 37, 42 (1980). Shortly after the trial court issued its opinion in this case, our Supreme Court decided *Devlin v. City of Philadelphia*, 580 Pa. 564, 862 A.2d 1234 (2004).[12] There, the Supreme Court indicated that a municipality's authority to enact anti-discrimination laws is derived from its police powers. Because that case was filed after the learned trial judge decided the matter at bar, he did not have the benefit of its reasoning.

In *Devlin*, residents of Philadelphia brought action seeking to declare invalid three ordinances involving the new status of "Life Partners" between members of the same sex and addressing health benefits, discrimination and realty transfer tax. Residents also sought to permanently enjoin the City from implementing a "Life Partner" registry.

As a preliminary matter, the Supreme Court in *Devlin* noted that even before the amendments at issue, the City's ordinance already had prohibited discrimination based on "sexual orientation." The Court was "confident that any such discrimination was already prohibited as discrimination based on sexual orientation." *Id.* at 1247. Accordingly, the Supreme Court

failed to see how the City had materially increased the protection it affords to those in Life Partnerships by prohibiting discrimination based on an individual's status as a Life Partner. *Id.* at 1247–1248. Accordingly, the Supreme Court held that the City did **not** exceed its home rule powers when it enacted an ordinance designating same-sex "life partners" as a marital status and that the City was entitled to extend employee benefits to employees' same-sex "life partners." *Id.* at 1245–47. However, the Court found that the provisions allowing for registration of life partners, as drafted, "invite[d] individuals who neither live nor work in the City to ... register as Life Partners solely as a means to solidify their full rights to be free from discrimination on account of their Life Partner status when, if ever, they come into the City"; the Court then determined that it was beyond the City's powers to enact such provisions. *Id.* at 1248. The City's police power does not allow it to enact ordinances that extend beyond its borders.[13] What is critical for the case *sub judice* is that the Supreme Court indicated that the authority to enact anti-discrimination laws does derive from a municipality's police powers. *Id.*

Interestingly, as authority for this proposition, the *Devlin* Court cited *Western Pa. Restaurant Ass'n v. City of Pittsburgh*, 366 Pa. 374, 381–82, 77 A.2d 616, 620 (1951), which held that a city may validly enact an ordinance to safeguard the public health by regulating the operation of restaurants within its city limits, even though a state statute, which covered substantially the same

---

**12.** *Devlin* involved the City of Philadelphia, a Home Rule City of the First Class. Its enabling legislation does not contain the limitations in Section 2962(f) of the Home Rule Law.

**13.** The Court also held that exemption to realty transfer tax for transfers between "Life Partners" violated the Uniformity Clause of the Pennsylvania Constitution. *Devlin*, 862 A.2d at 1248.

ground with the same objectives, was in effect. There, the state statute provided that every proprietor of a public eating or drinking place must obtain a license upon inspection by the health authorities, and also authorized the health authorities to make rules and regulations as necessary to carry out the intent of the statute. The city ordinance also required licenses but, in addition, required permits for the operation of the establishments; prohibited the sale of adulterated, unwholesome or misbranded food or drink; examined all employees; regulated the construction of the establishments; regulated inspections that were to occur at least two times a year; and, implemented grading of establishments and notice of the grading for the public's information. *Id.* at 378, 77 A.2d at 618. The Court stated that a legislative body may exercise its police power by imposing reasonable limitations and regulations upon the operation and conduct of businesses, which apply equally to all who are engaged in the restaurant business, for the health of its people. *Id.* at 384, 77 A.2d at 621. The Court held that the city ordinance was not preempted by the state statute unless it was inconsistent with the state statute. The Court focused on the fact that a municipality with subordinate powers to the state may "make such additional regulations in aid and *furtherance of the purpose of the general law* as may seem appropriate to the *necessities of the particular locality* and which are not in themselves unreasonable." *Id.* at 381, 77 A.2d at 620 (emphasis added). The Court noted that the city ordinance was "adequate to the protection of the public health and comfort of patrons." *Id.* at 382, 77 A.2d at 620.[14]

In relying on *Western Pa. Restaurant Ass'n,* the *Devlin* Court highlighted the authority of a municipality to enact anti-discrimination laws under its police powers. Such laws protect a municipality's citizens. Here, just like the City of Philadelphia in *Devlin* and the City of Pittsburgh in *Western Pa. Restaurant Ass'n,* the City of Allentown duly enacted a regulation under its police powers to protect its citizens. Moreover, we note that the Supreme Court in *Devlin* favorably discussed the City of Philadelphia's human relations ordinance and noted that, even before the amendment to allow for Life Partnerships, the human relations ordinance had already prohibited discrimination based on sexual orientation. *Id.* at 1247. Furthermore, in *Western Pa. Restaurant Ass'n,* the Court allowed the City to exercise its police power by imposing reasonable limitations and regulations upon the operation and conduct of businesses, which apply equally to all who are engaged in the restaurant business, for the health of its people. *Id.* at 384, 77 A.2d at 621.

■ We must now address whether the limitation in Section 2962(f), which limits the "regulation of business," should be interpreted to prohibit Allentown from enacting the anti-discrimination Ordinance at issue here. The limitations in Section 2962(f) apply only to home rule municipalities. The Optional Third Class City Charter Law does not contain this limitation. Therefore, third class cities, such as Harrisburg, are not similarly limited by such a provision. In fact, the City of Harrisburg, which had been a party in this case in the trial court, has enacted an ordinance similar to the one at issue here. As Allentown and *Amici* point out, under a broad inter-

---

**14.** We note that *Western Pa. Restaurant Ass'n* involved the City of Pittsburgh, which is a city of the second class and governed by what is commonly referred to as the Second Class City Code, Act of March 7, 1901, P.L. 20, *as amended,* 53 P.S. §§ 22101–25851.

pretation of Section 2962(f), it is anomalous that third class cities which have not adopted home rule, such as Harrisburg, are *not prohibited* from enacting this type of ordinance, but a similar city that has adopted home rule *is prohibited.* Had Allentown not adopted Home Rule, which is designed to give a municipality broad powers, the trial court would have upheld the City's authority to enact this Ordinance.

Allentown argues that Section 2962(f), which is entitled "Regulation of Business," should be read narrowly and extend only to *affirmative* duties placed on businesses and employers by home rule municipalities.

The phrase, "regulation of business," is found in other statutes which place limitations on non-home rule forms of municipal government. These statutes are quite specific and focus on or limit the *affirmative* duties that non-home rule municipalities can place on businesses and employers. For example, Section 1532 of The Second Class Township Code,[15] is entitled "Regulation of business," and gives authority to the board of supervisors to license and regulate business activities within the township. These regulations, which touch the very essence of managing a business, permit the board of supervisors to regulate: 1) transient merchants and their proceeds; 2) cable television companies to the extent allowed by law; 3) restaurants, including inspections of such establishments; and, 4) junk dealers and maintenance of junk yards. 53 P.S. § 66532. Another example has been collected in Purdon's Statutes as the General Municipal Law, Chapter 19, entitled "Regulation of Businesses and Occupations," 53 P.S. §§ 4401–4742. There, each city, borough, town and township has been given authority to regulate businesses for the purpose of protecting the public. *See* Section 1 of the Act of April 3, 1947, P.L. 55, *as amended,* 53 P.S. § 4401. This regulation of business also allows the municipality to raise additional revenue through its control of a myriad of business management functions, including, *inter alia:* 1) junk shops;[16] 2) brass and bronze cemetery monuments;[17] 3) close out, damaged goods, and defunct business sales;[18] 4) markets;[19] 5) motor vehicle sales;[20] 6) employment agencies in cities of the first and second class;[21] 7) plumbing in second, second class A, and third class cities;[22] and, 8) dance halls.[23] *See also* Purdon's Statutes, Title 53, Municipal and Quasi-municipal Corporations, Part II, Cities of the First Class: Chapter 40 "Regulation of Business and Occupations," 53 P.S. §§ 15321–15405; Chapter 44 "City of Philadelphia," Article X "Regulation of Business," 53 P.S. §§ 16721–16726; Chapter 62 "Regulation of Business and Occu-

---

**15.** Act of May 1, 1933, P.L. 103, *as amended, added by* Section 1 of the Act of November 9, 1995, P.L. 350, 53 P.S. § 66532.

**16.** Act of April 11, 1899, P.L. 37, *as amended,* 53 P.S. §§ 4431–4433.

**17.** Act of May 10, 1974, P.L. 292, 53. P.S. §§ 4441–4445.

**18.** Act of July 31, 1963, P.L. 410, 53 P.S. §§ 4471–1–4471–16.

**19.** Act of March 18, 1775, 1 Sm.L. 397, 53 P.S. § 4491.

**20.** Act of June 1, 1915, P.L. 685, repealed as to third class cities by Section 4701 of the Act of June 23, 1931, P.L. 932, 53 P.S. § 4511.

**21.** Act of April 25, 1907, P.L. 106, *as amended,* 53 P.S. §§ 4541–4554.

**22.** Act of June 7, 1901, P.L. 493, *as amended,* 53 P.S. §§ 4591–4669.

**23.** Act of May 16, 1919, P.L. 193, repealed as to third class cities by Section 4701 of the Act of June 23, 1931, P.L. 932, 53 P.S. §§ 4731–4742.

pations," 53 P.S. §§ 25251–25325. Thus, a narrow reading of Section 2962(f) of the Home Rule Law is consistent with the Legislature's intent, expressed elsewhere, that the phrase "regulation of business" means affirmative duties being placed on businesses.

■ Significantly, none of these other statutes prohibit the municipality's authority to enact anti-discrimination legislation. Section 2962(f), which is a limitation on home rule authority, is much less specific than the statutes regulating non-home rule municipalities. Given that home rule municipalities are to have more authority than non-home rule, we do not believe that Section 2962(f) is intended to place more stringent limitations on home rule municipalities than its counterparts do in non-home rule municipalities.

Our decision in *Smaller Mfrs. Council v. Council of the City of Pittsburgh*, 85 Pa. Cmwlth. 533, 485 A.2d 73 (1984), which is the only reported opinion that interprets the limitation provision in Section 2962(f), is consistent with this narrow interpretation of Section 2962(f). In *Smaller*, we applied an earlier version of Section 2962(f) of the Home Rule Law to invalidate a Pittsburgh ordinance that required businesses to take specific, affirmative steps, including providing written notice to the Bureau of Business Security,[24] and meeting with a committee from the City, if they should ever decide to close down a plant, relocate, or reduce their operations such that there would be a loss of employment of fifteen percent or more of their employees. *Id.* at 74, 78. We concluded that the City's ordinance violated the express language of the Act because it allowed the City to "determine the duties, responsibilities or requirements placed upon businesses." *Id.* at 77 (quoting Section 302(d), an earlier version of Section 2962(f) of the Home Rule Law). Therefore, this Court held that if the City wanted to act in this area it must be empowered to do so by the General Assembly. *Id.* at 77.

We agree with Allentown that the ordinance in *Smaller* was designed and intended to place affirmative duties of business management on businesses in Pittsburgh; that is far different from the Ordinance at issue here. The requirements in the *Smaller* ordinance, that employers or businesses notify a City-created Bureau if a "business decision" was made (in order for the Bureau to decide if an employer could close, leave the city limits, or reduce its work force), go to the heart of business management and usurp the role of management.[25] However, in this case, there is

---

24. The written notice required as follows:

> (1) Employers of 50–100 employees shall give 90 days prior notification;
> (2) Employers of 101–500 employees shall give 180 days prior notification; and,
> (3) Employers of 501 or more shall give 270 days prior notification.

*Smaller*, 485 A.2d at 74. In addition, the Bureau of Business Security had the right to determine that proper notice could be less than was required under the ordinance. *Id.*

25. We note that the actual text of the ordinance was attached to the *Smaller* opinion in the appendix which listed the Bureau's rights and duties in managing the operation of businesses in Pittsburgh. *See Smaller*, 485 A.2d

at 77–79. For example, Section 5(C) of the ordinance provides that the Bureau shall develop written criteria for the notice that businesses must provide if they plan to relocate, downsize, or close; Section 6 gives the Bureau authority to conduct a thorough investigation and power to request additional information from businesses that make a decision to relocate, downsize, or close; Section 7 authorizes the Bureau to make a report of its findings from the investigation and also to make recommendations regarding actions required to be taken in order to prevent or minimize the harmful effects that result from the change of operations; and, Section 8 allows the Bureau, if businesses disagree with its recommendations, to convene a meeting of

no evidence that Allentown designed or intended to impose affirmative duties of business management on businesses; rather, the Ordinance is intended to protect Allentown's citizens from discrimination.

Based on the Supreme Court's recent opinion in *Devlin,* in which the Court favorably discussed anti-discrimination legislation as authorized by a municipality's police power, the policy and purpose underlying home rule authority, and because other statutes which limit a non-home rule municipality's regulation of business do not apply to anti-discrimination legislation, we hold that the Ordinance is not *ultra vires.*[26]

### II. Preemption

■■■ Next, we address the issue of whether the PHRA preempts the Ordinance.[27] Preemption is a judicially created principle based on the proposition that a municipality, as an agent of the state, cannot act contrary to the state. *Duff v. Township of Northampton,* 110 Pa. Cmwlth. 277, 532 A.2d 500 (1987), *affirmed,* 520 Pa. 79, 550 A.2d 1319 (1988). In other words, a municipality may be foreclosed from exercising police power it would otherwise have if the Commonwealth has sufficiently acted in a particular field. *Id.* at 504. The ultimate question, then, is "whether the legislature intended

its action to preclude the exercise of the delegated police powers." *Id.* It is the policy of the Pennsylvania courts to disfavor a finding of preemption "unless the Commonwealth has explicitly claimed the authority itself, or unless there is such actual, material conflict between the state and local powers that only by striking down the local power can the power of the wider constituency be protected." *United Tavern Owners of Philadelphia v. Philadelphia Sch. Dist.,* 441 Pa. 274, 280, 272 A.2d 868, 871 (1971). Therefore, there is no presumption that a state has preempted a field merely by legislating in it; rather, the General Assembly must clearly show its intent to preempt a field in which it has legislated. *Duff,* 532 A.2d at 503 (quoting *Council of Middletown Township v. Benham,* 514 Pa. 176, 180, 523 A.2d 311, 313 (1987)). In fact, the General Assembly preempts a field only where the state has retained *all* regulatory and legislative power for itself and *no* local legislation is permitted. *Id.* at 504.

*Duff* sets out five pertinent questions helpful to determining the preemption issue:

(1) Does the ordinance conflict with the state law, either because of conflicting policies or operational effect, that is,

---

all interested parties and direct all parties to prepare a plan that would prevent unemployment from occurring as a result of the reduction in operations, and minimize economic disruption to the effected community. *Id.*

**26.** The parties also take issue as to whether the rule of *ejusdem generis* should be applied to limit Section 2962(f) to issues of taxation. However, because of our disposition of this matter, we need not reach this argument.

**27.** In response to Allentown's brief, Appellees argue not only that the Ordinance is in violation of the Home Rule Law, but *also that the PHRA preempts the Ordinance.* Appellees did not file a cross-appeal regarding the latter argument because they were not aggrieved,

pursuant to Pa. R.A.P. 501, by the trial court's Order.

> Generally only an 'aggrieved' party has standing to appeal. Pa. R.A.P. 501. Where a party is successful in the trial court, that party is not aggrieved and, therefore, has no standing to appeal. . . . We have specifically stated that 'mere disagreement with the ... legal reasoning [of the tribunal whose order is being reviewed] ... does not confer standing [to appeal]' . . . .

*Bldg. Indus. Ass'n of Lancaster County v. Manheim Township,* 710 A.2d 141, 147–148 (Pa.Cmwlth.1998) (quoting *Mahanoy Area Sch. Dist. v. Budwash,* 146 Pa.Cmwlth. 72, 604 A.2d 1156, 1159 (1992)).

does the ordinance forbid what the legislature has permitted? (2) Was the state law intended expressly or impliedly to be exclusive in the field? (3) Does the subject matter reflect a need for uniformity? (4) Is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation? (5) Does the ordinance stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature?

*Id.,* 532 A.2d at 505. The distaste for "field" preemption is apparent from the fact that our Supreme Court has totally preempted local regulation in only three fields: alcoholic beverages, anthracite strip mining and banking. *See Council of Middletown Township,* 514 Pa. at 182, 523 A.2d at 314.

The trial court found that the PHRA does not preempt the Ordinance. Appellees argue that the trial court erred because the PHRA does not expressly allow Allentown to expand its anti-discrimination Ordinance; instead, they argue it empowers Allentown to create a local human relations commission. 43 P.S. §§ 957, 962.1(a).[28] Appellees contend that because municipalities only have power to the extent that the PHRC has power, 43 P.S. § 962.1(d),[29] and, because the PHRC does not have the power to prohibit choices on the basis of "sexual orientation" and "gender identity," neither does Allentown.[30] For this proposition, Appellees rely on two cases, *City of Pittsburgh Comm'n on Human Relations v. DeFelice,* 782 A.2d 586, 590 n. 5 (Pa.Cmwlth.2001) (noting that the authority of the City of Pittsburgh to enact and enforce provisions in the Pittsburgh Code prohibiting discrimination in housing on the basis of race, color or national origin is "derived from the PHRA.") and *Riedel v. Human Relations Comm'n,* 703 A.2d 1072, 1074 (Pa.Cmwlth.1997)(holding that the City of Reading could not confer upon its human relations commission the authority to outlaw discriminatory housing practices based on the legal theory of interference of one's quiet enjoyment of one's residence, even if such practices are prohibited by the federal Fair Housing Act, because the local commission's authority cannot exceed that of the PHRC under the PHRA, and the PHRA does not prohibit such practices). The Supreme Court reversed our decision in *Riedel* because this Court improperly reversed the trial court's order on the basis of a waived issue that this Court raised *sua sponte.* 559 Pa. 33, 739 A.2d 121 (1999).

In *Riedel,* the appellee filed a complaint with the local commission alleging that the appellant was harassing her and her children by making derogatory, obscene and hostile remarks to them. *Id.,* 703 A.2d at 1073. The local commission *found* that the appellant engaged in an "unlawful discriminatory housing practice" by interfering with the appellee's right to the quiet enjoyment of her apartment in violation of the local ordinance. *Id.*[31] The appellant ap-

---

**28.** Section 12.1(a) of the PHRA states, in pertinent part, that "[t]he legislative body of a political subdivision may, by ordinance or resolution, authorize the establishment of membership in and support of a Local Human Relations Commission." 43 P.S. 962.1(a).

**29.** Section 12.1(d) states that "legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act." 43 P.S. 962.1(d).

**30.** For a listing of the PHRA protected classes against discrimination, *see* p. 2, n. 5.

**31.** Section 155.03(f) of the local ordinance defined a "discriminatory housing practice" as:

pealed to the trial court, contending that his actions did not constitute a discriminatory housing practice under the ordinance, that the Reading Commission's findings were not supported by the evidence of record, that two of the local commission's members who signed the decision were actually not present at the hearing, and that the local commission's decision was unjustified. *Riedel,* 559 Pa. 34, 37, 739 A.2d 121, 123 (1999). The trial court ultimately dismissed the appeal. *Id.* On appeal to this Court, the appellant raised the same issues it did before the trial court. This Court, however, did not address the issues raised by the appellant. Instead, this Court *sua sponte* addressed a different issue: whether the local commission had the authority to enact and enforce a section of its ordinance when no corresponding provision, proscribing the same discriminatory conduct existed in the PHRA. *Id.* This Court reversed the local commission and held that the City of Reading could not confer upon its human relations commission the authority to outlaw discriminatory housing practices based on the legal theory of interference of one's quiet enjoyment of one's residence, even if such practices are prohibited by the federal Fair Housing Act, because the local commission's authority cannot exceed that of the PHRC under the PHRA, and the PHRA does not prohibit such practices. *Riedel,* 703 A.2d at 1074. The appellee filed a Petition for Allowance of Appeal. The Supreme Court granted allocatur to determine whether this Court "properly raised the issue of the [local] [c]ommission's authority to act in this case *sua sponte* and if so, whether [this] Court's determination that the [c]ommission had

exceeded its authority by enacting and enforcing [the ordinance] was proper." *Riedel,* 559 Pa. at 38, 739 A.2d at 123.

The Supreme Court held in *Riedel* that this Court improperly reversed the trial court's order on the basis of a waived issue that this Court raised *sua sponte*. Because the issue did not involve a matter of the commission's jurisdiction, the Supreme Court held that this Court could not properly *sua sponte* raise the issue under the jurisdictional exception to the waiver rule. *Id.* at 41, 739 A.2d at 125. Accordingly, the Supreme Court **reversed** our order and remanded for consideration of those issues properly preserved for review before our Court. In a footnote, the Supreme Court clarified that it was **not addressing the merits** of the preemption issue:

> We note that our decision today does not in any way address the merits of the issue of whether local human relations commissions have the authority to proscribe discriminatory conduct which is not rendered unlawful by the PHRA.

*Id.* at 41 n. 1, 739 A.2d at 125 n. 1. Our decision in *Riedel* involved only one issue, that of preemption. The propriety of raising the preemption issue *sua sponte,* was the only question addressed by the Supreme Court. Although the Supreme Court reversed this Court, it did so only on the basis that the preemption issue was not properly before this Court; in other words, the Supreme Court explained that the Commonwealth Court had no authority to decide the preemption issue at all. Thus, our decision on preemption was rendered a nullity. Therefore, our decision in

---

an act that is either unlawful under the provisions of this Ordinance or is unlawful under section 804, 805, 806, or 818 of the Federal Fair Housing Act [42 U.S.C. §§ 3604, 3605, 3606, or 3617] or Section

955 or 955(h) of the Pennsylvania Human Relations Act.
*Riedel,* 703 A.2d at 1074 (quoting Section 155.03(f) of Reading Human Relation Ordinance).

*Riedel,* 703 A.2d 1072, is not binding precedent on the preemption issue.

▮ Even if our opinion in *Riedel* was binding precedent, another fundamental problem with Appellees' argument is that it fails to recognize that a municipality has the power to adopt ordinances as a reasonable exercise of its police powers. *See Commonwealth v. Brandon,* 872 A.2d 239 (Pa.Cmwlth.2005). There is a distinct difference between a municipality's authority, pursuant to its police powers, to *enact* local anti-discrimination ordinances and a local human relations commission's powers and duties to *enforce* those ordinances once adopted. Section 12.1(d) of the Act, which states that "legislative bodies of political subdivisions shall have the authority to grant to local commissions powers and duties similar to those now exercised by the Pennsylvania Human Relations Commission under the provisions of this act," is not the source of the municipalities power to enact an anti-discrimination ordinance. 43 P.S. 962.1(d). The power to enact the ordinance is derived from the police power. *See Devlin,* 862 A.2d at 1248. In *Riedel,* a *violation* of the ordinance was *found* to have occurred, thus, *enforcement* was the issue. Here, on the other hand, as in *Devlin,* a violation of the Ordinance has not been established; rather, the question before this Court is whether a Home Rule municipality may *enact* anti-discrimination provisions in its Ordinance.

In *Riedel,* this Court based its decision on an earlier decision in *City of Pittsburgh Comm'n on Human Relations v. MacBeth,* 391 A.2d 1109, 1110 (Pa.Cmwlth. 1978). There, the issue before this Court was whether the local commission had authority under the local human relations ordinance to order the appellee, adjudged to have committed a discriminatory act, to pay the attorney's fees of the successful complainant. *Id.* The local commission ordered the appellee to cease and desist from discriminating on the basis of race in connection with rental housing accommodations and to prepare and file an affirmative action program. Additionally, the appellee was ordered to compensate the complainant for any legal expense incurred by her in retaining an attorney. *Id.* The trial court affirmed the local commission as to the cease and desist order and the affirmative action program, but also reversed, in part, the local commission, finding that it acted without authority in awarding attorney's fees. On appeal to this Court, we affirmed. In explaining Section 12.1 of the Act, we stated that "the General Assembly, while desirous of extending to municipalities the right to establish local commissions, *did not intend to extend to local commissions* powers or duties above and beyond those possessed by the Pennsylvania Human Relations Commission (PHRC)." *Id.* at 1110–11 (emphasis added). The local ordinance did not specifically provide for the award of attorneys' fees; therefore, this Court analyzed the scope of power conferred upon the PHRC by the Act. We held that the local commission exceeded its scope because the Act was silent in authorizing the PHRC to award damages and, therefore, because damages have been a matter for courts of law, the PHRC's scope of authority cannot be broadened "into a full-scale lawsuit." *Id.* at 1111–12 (quoting Judge Kramer in *Zamantakis v. Com., Human Relations Comm'n,* 10 Pa.Cmwlth. 107, 308 A.2d 612, 616 (1973)). Because the PHRC did not have the administrative authority to award damages, it followed that the local commission did not have the authority "absent clear authorization in the [local] Ordinance." *Id.* at 1112. Thus, *MacBeth* explicitly states that a local commission can first look to a local ordinance for authority and then, if none is found, can *then look to the PHRA.* Our decision

in *Riedel* did not accurately quote our holding in *MacBeth* because *MacBeth* did not stand for the proposition that substantive rights found in the PHRA cannot be expanded by a local ordinance.

The powers and duties of a local commission formed to enforce a municipal ordinance and the power of a municipality to legislate for the general health and welfare of its citizenry are distinct and derive from different sources. Section 12.1 of the Act does not address a municipality's police powers and cannot preempt such action. This interpretation is consistent with our recent Supreme Court decision in *Devlin.* Although the issue of preemption was not presented, the *Devlin* Court noted that Philadelphia *"generally has authority to enact anti-discrimination laws pursuant to its police powers." Devlin,* 862 A.2d at 1248 (emphasis added). We note that the Supreme Court did not limit the city's authority to only those protections listed in the PHRA. In fact, the Supreme Court referred to Philadelphia's ordinance, which prohibits discrimination on the basis of "sexual orientation" and "gender identity," and did not find the ordinance to be problematic or inconsistent with the PHRA.[32]

Appellees also contend that the PHRA is meant to be exclusive in the field of anti-discrimination and that it is for the legislature to articulate and expand the realm of protected classes. They maintain that had the Legislature desired to establish additional classes of protection, it would have done so in 1997 when the PHRA was last amended. Additionally, Appellees contend that there is a need for uniformity because, if anti-discrimination laws vary from municipality to municipality, it "cheapens" rights against anti-discrimination generally and undermines their legitimacy. Finally, they argue that the PHRA deals comprehensively with what constitutes a protected class and lists them in Sections 2, 3, 5, and 12 of the Act. *See* 43 P.S. §§ 952, 953, 955, 962.

The trial court was correct in finding that the PHRA does not preempt the Ordinance. First, there is no inherent conflict between the PHRA and the Ordinance. Section 12.1(d) of the PHRA solely addresses the powers enjoyed by local human relations commissions; it does not control Allentown's power or authority to enact laws against discrimination. Second, enforcement of the PHRA is in no way impeded by Allentown's Ordinance, which prohibits additional categories of discrimination. Third, the PHRA was not intended to be exclusive in the field of anti-discrimination. Section 12, entitled "Construction and exclusiveness of remedy," is the sole preemptive provision of the PHRA, which states that "any law inconsistent with any provisions hereof shall not apply." *See* 43 P.S. § 962(a). On the other hand, Section 12(b) upon which Appellees rely, states in pertinent part:

> Except as provided in subsection (c), nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance, ... relating to discrimination because of race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability....

43 P.S. § 962(b). This section of the PHRA makes clear that the General Assembly intended to preserve anti-discrimination ordinances from preemption. In fact, legislative intent supports this finding. Legislative history reveals that the General Assembly wanted to preserve local

---

**32.** It is also worth noting that a finding of preemption would not affect just the City of Allentown but, rather, would affect *every mu-*nicipality within this Commonwealth because preemption is not dependent on a municipality's form of government.

power to enact greater protections against discrimination. In discussing Senate Bill 53, now codified at 43 P.S. § 962(b) of the Act, Senate Majority Leader Weiner stated that, "if [municipalities] decide to take more stringent action or less stringent action, they can do so because the local police power is the basic police power which seems to operate in these areas." Senate Journal, S. 53 at 300 (Pa.1961). Additionally, the legislative debate did *not* specifically address concerns that new classifications might be someday *added* to a municipal ordinance. House Journal, H. 53 at 502–511. Ultimately, Senate Bill 53 passed and retained the present Section 12, now codified as Section 962(b) of the Act. There have been no amendments to reflect the opposition's belief that "all the people of the Commonwealth of Pennsylvania [should] be governed by one act. . . ." *Id.* at 507.

Finally, the PHRC, as *Amicus,* and the sole agency in charge of interpreting and enforcing the PHRA, stands by the Ordinance in support of added protections against discrimination on the basis of sexual orientation and gender identity. The PHRC submitted briefs and oral argument in support of finding that the Ordinance is entirely consistent with the PHRA in that its purpose is to eliminate the "evils" of discrimination and, thus, does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of the PHRA because they share a common purpose. Moreover, the PHRC supports the Ordinance in its entirety because the PHRA neither implicitly nor expressly preempts the protections enacted by Allentown, and because the public policy of the PHRA and the Commonwealth is served, not violated, by the Ordinance.

As an intermediate appellate court, our duty is to decide the issues before us consistent with the precedent of our Supreme Court. We, therefore, hold that the PHRA does not preempt the Ordinance because: 1) *Riedel* is not binding precedent on the issue of preemption, 2) our Supreme Court's decision in *Devlin* looks favorably on the autonomy of each municipality to provide protections to accommodate its citizens in the area of anti-discrimination, and 3) the PHRC is entitled to some deference in its interpretation of the PHRA.[33]

Based on the foregoing opinion, we affirm the trial court to the extent that it held that the PHRA does not preempt the Ordinance. We reverse the trial court to the extent that it held that the Ordinance is *ultra vires.*

### ORDER

**NOW,** August 11, 2005, the order of the Court of Common Pleas of Lehigh County in the above-captioned matter is hereby affirmed to the extent that it held that the Pennsylvania Human Relations Act does not preempt the Ordinance and reversed to the extent that it held that the Ordinance violated the Home Rule Charter and Optional Plans Law.

---

**33.** The Ordinance is also consistent with Pennsylvania's Hate Crime Law, which states that the offense of ethnic intimidation is committed if a person "with malicious intention toward the actual or perceived race, color, religion, . . . *sexual orientation,* gender or *gender identity* of another individual or group of individuals, . . . he commits an offense under any other provision of this article or under Chapter 33 (relating to arson, criminal mischief and other property destruction). . . ." 18 Pa.C.S. § 2710(a)(emphasis added).