IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Apartment Association of Metropolitan : 
Pittsburgh, Inc. : 
 : 
 : 
v. : No. 528 C.D. 2018
 : ARGUED: February 11, 2020
The City of Pittsburgh, : 
Appellant : 

BEFORE:  HONORABLE ANNE E. COVEY, Judge
 HONORABLE CHRISTINE FIZZANO CANNON, Judge
 HONORABLE ELLEN CEISLER, Judge

OPINION BY JUDGE CEISLER                    FILED:  March 12, 2020

This matter returns to us on remand from the Supreme Court of Pennsylvania for reconsideration in light of its recent decision in *Pennsylvania Restaurant and Lodging Association v. City of Pittsburgh*, 211 A.3d 810 (Pa. 2019).

The City of Pittsburgh (City) appeals from the March 14, 2018 Order of the Court of Common Pleas of Allegheny County (Trial Court), which granted the Motion for Summary Judgment filed by Apartment Association of Metropolitan Pittsburgh, Inc. (Apartment Association) and denied the City's Motion for Judgment on the Pleadings.  The question presently before this Court is whether, under the Pennsylvania Supreme Court's analysis in *Pennsylvania Restaurant*, the City had express statutory authority to enact an ordinance prohibiting housing discrimination against City residents based on their sources of income.  For the reasons that follow, we conclude that the City did not have such authority and, therefore, affirm the Trial Court's Order.

## Background

The City is a home rule municipality governed by the Home Rule Charter and Optional Plans Law (Home Rule Law), 53 Pa. C.S. §§ 2901-2984. The City is also a city of the second class under what is known as the Second Class City Code.[1]

Apartment Association is a nonprofit corporation whose members are property owners, managers, and landlords in the business of renting residential properties in the City. Apartment Association's 200-plus members own and/or manage approximately 30,000 residential rental units in the City.

Housing is provided to many low-income tenants in the City through housing subsidies, the most well-known of which is the federal Section 8 Housing Choice

---

[1] The Second Class City Code is comprised of several legislative acts. The statutory provision applicable to this appeal is Section 3 of the Second Class City Code, Act of March 7, 1901, P.L. 20, *as amended*, 53 P.S. § 23158.

This Court has explained:

> The adoption of a home rule charter acts to remove a municipality from the operation of the code provisions enumerating the powers of that particular class of municipality. Once a municipality adopts a home rule charter, "it is no longer a city of the second class, a county of the third class, a borough or a township of the first or second class, but a 'home rule municipality' and its 'code' is the [Home Rule Law]."

*Ziegler v. City of Reading*, 142 A.3d 119, 131 (Pa. Cmwlth. 2016) (internal citations omitted). Nonetheless, "[a]lthough a home rule municipality is not restrained by its former municipal code, it is not prohibited from exercising powers provided thereunder." *Id.* Thus, despite its home rule status, the City may still exercise certain powers provided by the Second Class City Code. *See Pa. Rest.*, 211 A.3d at 824-25 (finding that the City's status as a home rule municipality did not preclude it from attempting to resort to the Second Class City Code as express authority for its challenged ordinances).

Voucher Program (Section 8 Program).[2]  According to the Housing Authority of the City of Pittsburgh (Housing Authority), 41% of City residents with housing vouchers return them unused, due in part to their landlords' refusal to accept the vouchers.

In December 2015, the City enacted Ordinance 2015-2062 (Ordinance).  The Ordinance amended certain provisions of the City's Code of Ordinances by adding a new protected class of persons based on the source of income used to pay rent. The purpose of the Ordinance was to prevent residential property owners, real estate brokers, and others from denying a person access to housing based on his or her source of income.

Section 1 of the Ordinance defines "source of income" as follows:

> All lawful sources of income or rental assistance program [sic], including, but not limited to, earned income, child support, alimony, insurance and pension proceeds, and *all forms of public assistance including federal, state and local housing assistance programs.  This includes the Section 8 Housing Choice Voucher Program.*

Reproduced Record (R.R.) at 78a, 83a (emphasis added).  Section 2 of the Ordinance provides that the following acts shall be unlawful housing practices:

> (a) For any owner, real estate broker or any other person to refuse to sell, lease, sublease, rent, assign or otherwise transfer, or to refuse to negotiate for the sale, lease, sublease, rental, assignment or other transfer of, the title, leasehold or other interest in any dwelling to any person, or to represent that any dwelling is not available for inspection, sale, lease, sublease, rental, assignment or other transfer when in fact it is so available, *or otherwise to deny or withhold any dwelling from any person because of . . . source of income . . .* or to discriminate against, segregate or assign quotas to any person or group of persons in

---

[2] Housing is subsidized by the federal government pursuant to Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f.  The Section 8 Program is administered by the United States Department of Housing and Urban Development (HUD).  On the local level, the Section 8 Program is administered by the public housing authority.

3

connection with the sale, lease, sublease, rental, assignment or other transfer of the title, leasehold, or other interest in any dwelling or dwellings.

(b) For any person, including any owner or real estate broker, to include in the terms, conditions or privileges of any sale, lease, sublease, rental, assignment or other transfer of any dwelling any clause, condition or restriction *discriminating against or requiring any other person to discriminate against, any person in the use or occupancy of such dwelling because of . . . source of income . . . of the user.*

(c) For any person, including any owner or real estate broker, to *discriminate in the furnishing of any facilities or services for any dwelling because of . . . source of income . . . of the user.*

. . . .

(f) For any real estate broker or real estate salesperson or agent, or any other person for business or economic purposes, to induce, directly or indirectly, or to attempt to induce directly or indirectly, the sale or rental or the listing for sale or rental, of any dwelling by *representing that a change has occurred or will or may occur regarding the entry or prospective entry into the neighborhood of a person or persons of a particular . . . source of income . . . .*

R.R. at 79a, 83a-85a (emphasis added).

On January 15, 2016, Apartment Association filed a Complaint for Equitable Relief and Request for Declaratory Judgment against the City. In its Complaint, Apartment Association alleged that the Ordinance violated both the Home Rule Law and the Pennsylvania Constitution. It also sought a preliminary injunction to stay enforcement of the Ordinance. On February 9, 2016, the Trial Court issued an Order staying the implementation and enforcement of the Ordinance until further order of the Trial Court.

4

On June 29, 2017, the City filed an Answer and New Matter, to which Apartment Association replied on July 10, 2017. On October 13, 2017, the parties filed Stipulations of Fact with the Trial Court.

On November 17, 2017, the City filed a Motion for Judgment on the Pleadings, and Apartment Association filed a Motion for Summary Judgment. The Trial Court heard argument on the Motions on January 25, 2018. Thereafter, on March 14, 2018, the Trial Court granted Apartment Association's Motion, denied the City's Motion, and declared the Ordinance invalid and unenforceable. The Trial Court concluded as follows:

> The City's Ordinance makes participation in the Section 8 [P]rogram mandatory. Landlords will be forced to comply with the numerous and often burdensome requirements of the Section 8 [P]rogram. For example, they will have to use the Housing Authority's model lease and/or submit a preferred lease to the Housing Authority for pre[-]approval. That lease must include word[-]for[-]word provisions of the HUD Tenancy Addendum. They will be prohibited from including notice of termination waivers in leases and must accept a mandatory "cure period" of five days in advance of issuing a Notice to Quit. Landlords will be required to accept "reasonable rent" obligations as established by the Housing Authority and provide at least 60 days' notice of any change in rent amounts. They will have to obtain approval from the Housing Authority to raise a tenant's rent. Finally, landlords will be forced to agree to month-to-month leases subsequent to an initial one[-]year lease term. Neither Pennsylvania common law nor [the] Landlord and Tenant Act of 1951[, Act of April 6, 1951, P.L. 69, *as amended*, 68 P.S. §§ 250.101-250.602 (Landlord and Tenant Act),] contain[s] such requirements.
>
> There is no genuine issue of material fact as to whether the . . . Ordinance places affirmative duties and requirements on residential property owners, landlords and others in violation of the [Home Rule Law]. Pennsylvania [c]ourts have consistently held that home rule

municipalities must comply with the limitations of Section 2962(f) of the [Home Rule Law, 53 Pa. C.S. § 2962(f)].[3]

Trial Ct. Op., 3/14/18, at 4-5 (unpaginated). Therefore, because the Ordinance placed affirmative duties and responsibilities on businesses, the Trial Court concluded that the Ordinance violated Section 2962(f) of the Home Rule Law.

Following the City's appeal, on March 12, 2019, an *en banc* panel of this Court affirmed the Trial Court's decision. This Court held that although non-discrimination ordinances are a valid exercise of a home rule municipality's police powers, the Ordinance nonetheless violated Section 2962(f) of the Home Rule Law. In reaching this conclusion, we explained:

> While it is true that anti-discrimination ordinances are a valid exercise of a municipality's police powers, the Ordinance here . . . does more than just ban discrimination against certain protected classes of people. By defining "source of income" to include Section 8 Program subsidies, the Ordinance in this case necessarily mandates that all landlords in the City comply with the federal Section 8 Program requirements, when previously their participation in the Section 8 Program was voluntary. This is clearly an affirmative obligation and more invasive to the operation of rental business than [a] general anti-discrimination ordinance . . . .

*Apartment Ass'n of Metro. Pittsburgh v. City of Pittsburgh*, 205 A.3d 418, 425 (Pa. Cmwlth.) (*en banc*), *vacated and remanded*, 217 A.3d 801 (Pa. 2019).

---

[3] Section 2962(f) of the Home Rule Law states in relevant part:

> A municipality which adopts a home rule charter *shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers, . . . except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities. . . .*

53 Pa. C.S. § 2962(f) (emphasis added).

6

On April 11, 2019, the City filed a Petition for Allowance of Appeal with the Pennsylvania Supreme Court. On September 9, 2019, the Supreme Court granted the Petition for Allowance of Appeal, vacated this Court's March 12, 2019 Order, and remanded the matter for reconsideration in light of *Pennsylvania Restaurant*. In doing so, the Supreme Court directed this Court "to include in its review the sections of the Second Class City Code and the Pennsylvania Human Relations Act[, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963 (PHRA),] cited by the City." Supreme Ct. Remand Order, 9/9/19, at 1.

## Analysis

The question presently before this Court is whether the Second Class City Code or the PHRA expressly authorized the City to enact the Ordinance, which prohibits property owners from discriminating against potential lessees based on their sources of income. While the Ordinance defines "source of income" as including "*all forms of public assistance* including federal, state and local housing assistance programs," R.R. at 78a, 83a (emphasis added), the focus of the parties' arguments on appeal is the express inclusion of Section 8 Program vouchers in this definition. That was also the focus of the Trial Court's decision. The parties have not presented any arguments, nor does the record contain any evidence, relating to other state or local housing assistance programs encompassed by the source-of-income definition, nor are we aware of what requirements or obligations such other programs may place on residential landlords in the City. For this reason, we likewise focus our analysis on the portion of the source-of-income definition pertaining only to the federal Section 8 Program.

Under Section 2961 of the Home Rule Law, "[a] municipality which has adopted a home rule charter may exercise any powers and perform any function not

7

denied by the Constitution of Pennsylvania, by statute or by its home rule charter." 53 Pa. C.S. § 2961; *see* Pa. Const. art. IX, § 2. This provision must be liberally construed in the municipality's favor. *See* 53 Pa. C.S. § 2961 ("All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be liberally construed in favor of the municipality."). Our Court has recognized that "[t]he essential principle underlying home rule is the transfer of authority to control certain municipal affairs from the state to the local level. . . . This transference results in home rule municipalities having broader powers of self[-]government than non-home rule municipalities." *Hartman v. City of Allentown*, 880 A.2d 737, 742 (Pa. Cmwlth. 2005).

Notwithstanding a home rule municipality's broad powers, Section 2962(f) of the Home Rule Law imposes a limitation on the municipality's authority to enact certain types of legislation. This provision, commonly referred to as the "Business Exclusion," states:

> A municipality which adopts a home rule charter *shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers,* including the duty to withhold, remit or report taxes or penalties levied or imposed upon them or upon persons in their employment, *except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities.* This subsection shall not be construed as a limitation in fixing rates of taxation on permissible subjects of taxation.

53 Pa. C.S. § 2962(f) (emphasis added).

The first question to be determined in cases where the Business Exclusion is raised is whether the challenged ordinance imposes affirmative duties or requirements on businesses. *See Bldg. Owners & Managers Ass'n v. City of*

8

*Pittsburgh*, 985 A.2d 711, 714-15 (Pa. 2009); *Hartman*, 880 A.2d at 746; *Smaller Mfrs. Council v. Council of Pittsburgh*, 485 A.2d 73, 77 (Pa. Cmwlth. 1984). If the court concludes that the ordinance places affirmative duties and responsibilities on businesses, then the second question to be determined is whether the municipality's authority to enact the ordinance was "*expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities*." 53 Pa. C.S. § 2962(f) (emphasis added).[4] As discussed more fully below, the "expressly provided by statute[]" exception in the Business Exclusion was the focus of the Supreme Court's decision in *Pennsylvania Restaurant*.

## 1. *Pennsylvania Restaurant*

In *Pennsylvania Restaurant*, our Supreme Court considered whether two ordinances enacted by the City of Pittsburgh violated the Business Exclusion: (1) the Paid Sick Days Act (PSDA), which entitled employees of City businesses to accrue paid sick leave;[5] and (2) the Safe and Secure Buildings Act (SSBA), which

---

[4] As in *Pennsylvania Restaurant*, "resolving the question presented requires us to seek express statutory authority as conceived by the Business Exclusion. This principally constitutes an exercise in statutory construction involving a question of law, which we address *de novo*." *Pa. Rest.*, 211 A.3d at 822.

[5] According to the Supreme Court:

> [T]he PSDA provides that employees of employers with fifteen or more employees are entitled to accrue up to forty hours of paid sick leave per year at a rate of one hour of leave for every thirty-five hours worked. Employers with fewer than fifteen employees also must provide paid sick leave at the rate of one hour of leave per thirty-five hours worked. However, these employers may limit accrued leave to twenty-four hours per year.

*Pa. Rest.*, 211 A.3d at 818.

9

imposed education and training obligations on City building owners and their employees to improve disaster preparedness and counterterrorism efforts.[6] The objectors in that case were various employee unions and nonprofit associations whose members are business owners in the City. The objectors challenged both ordinances on the ground that they imposed affirmative obligations and responsibilities on private businesses in violation of the Business Exclusion. In response, the City argued that the ordinances satisfied the exception in the Business Exclusion, claiming that its authority to enact the ordinances was expressly authorized by several different Pennsylvania statutes.

The Supreme Court began its analysis by discussing the historical and legal background of the Home Rule Law. After examining the broad powers granted to home rule municipalities, including their police powers, the Supreme Court determined that the City's enactment of the PSDA did not exceed its home rule authority because the PSDA satisfied the exception in the Business Exclusion for express statutory authorization. *Pa. Rest.*, 211 A.3d at 832. The Court found such express authorization in the Disease Prevention and Control Law of 1955 (DPCL), Act of April 23, 1956, P.L. (1955) 1510, *as amended*, 35 P.S. §§ 521.1-521.21. In particular, Section 16(c) of the DPCL permits municipalities with departments of health to enact legislation "relating to disease prevention and control." 35 P.S. § 521.16(c). In *Pennsylvania Restaurant*, the objectors did not dispute that mandating paid sick leave for employees relates to disease prevention and control or that providing paid sick leave to employees has a beneficial effect on public health. *Pa.*

---

[6] The Supreme Court explained that "[t]he SSBA's provisions apply to 'covered properties,'" which "encompasses commercial office buildings or complexes, retail buildings or complexes, health care facilities, museums, and 'similar cultural institutions' occupying 100,000 or more square feet, as well as all colleges and universities, and all properties owned, managed, or occupied, wholly or in part, by the City." *Pa. Rest.*, 211 A.3d at 818 (quoting the SSBA).

10

*Rest.*, 211 A.3d at 828-29. Thus, the Court determined there was "no material dispute that the PSDA is, at least in the literal sense, 'an ordinance . . . relating to disease prevention and control'" under the DPCL. *Id.* at 829.

Further, the Supreme Court declined to read the term "express" in an overly strict manner, because doing so would "hamstring home-rule municipalities from exercising their home-rule authority in any way that burdens businesses, even where such burdens are incidental or *de minimis*." *Id.* at 832. The Court explained:

> It is unrealistic to expect the General Assembly to draft statutes providing the sort of surpassing specificity [the objectors] would demand, because it is impossible for any legislature to anticipate the innumerable ways in which any given ordinance might affect a given business's receipts or complicate its administration.
>
> Conversely, it is not unreasonable to anticipate that, when the legislature authorizes municipalities to enact ordinances, rules, or regulations in furtherance of disease prevention and control, it recognizes that such an authorization is not self-executing, and may entail action that burdens businesses in any number of ways, both foreseeable and unforeseeable. Consequently, we must consider the fact that the General Assembly did not more precisely cabin the legislative and regulatory authority it expressly granted municipalities in the DPCL in light of our obligation to construe ambiguous statutes in favor of the public interest over private interests, and in favor of local authority over state authority.

*Id.*

Applying these principles to its analysis of the PSDA, the Supreme Court held that the DPCL provided the City with express statutory authority to legislate in furtherance of disease prevention and control. The Court reasoned as follows:

> The burden the PSDA presents to businesses is not insignificant. *The ordinance nonetheless bears a direct nexus with public health, and, all things being equal, lies squarely within both the City's traditional*

11

*police powers and the ambit of the DPCL. Consequently, the PSDA is more like a "health or safety ordinance[]" that affects business than a statute with its principal focus upon regulating business for its own sake. . . .* For this reason, *we find the DPCL's legislative authorization to municipalities to "enact ordinances . . . relating to disease prevention and control" such as the PSDA sufficiently clear to satisfy the limited exception to the Business Exclusion.* Accordingly, we hold that the City did not exceed its home-rule authority in enacting the PSDA.

*Id.* (Emphasis added.).

The Supreme Court reached a different conclusion with respect to the City's enactment of the SSBA, which imposed education and training obligations on building owners and their employees to improve disaster preparedness and counterterrorism efforts. The City argued that its "express" authority to enact the SSBA arose from the Second Class City Code, the Home Rule Law, and the Emergency Management Services Code (Emergency Code), 35 Pa. C.S. §§ 7101-79a31. However, the Supreme Court found that none of these statutes provided express authority to satisfy the exception to the Business Exclusion.

The City first cited Section 1(*l*) of the Second Class City Code, which authorizes municipalities "[t]o provide for the preparation and distribution by the Department of Public Safety of rules and regulations to minimize the danger of fire and lessen fire waste." Act of May 13, 1915, P.L. 297, 53 P.S. § 25092. The Supreme Court found that while the purpose of this provision is to "'minimize the danger of fire and lessen fire waste,'" that "[was] not the core function of the SSBA." *Pa. Rest.*, 211 A.3d at 834 (quoting 53 P.S. § 25092). The City also cited Section 1(a) of the Second Class City Code, which allows for building inspections "to decrease and prevent fire, the spread of fire, and fire waste, loss of life from fire, and loss of life or damage to property from unsafe or improper construction or design."

Act of May 13, 1915, P.L. 297, 53 P.S. § 25081. The Court observed that both of these provisions "appear in an Article of the Second Class City Code covering 'Fire Prevention' and by their terms apply only to fire-related concerns." *Pa. Rest.*, 211 A.3d at 834. The Court found, however that fire-related concerns comprised only a small part of the disaster preparedness requirements of the SSBA. *Id.*

Likewise, the Supreme Court rejected the City's reliance on the Home Rule Law's provisions authorizing the enactment of building codes and safety regulations, because there was an insufficient nexus between such provisions and the SSBA's "education and training requirements." *Id.* at 835. The Court found that "the SSBA impose[d] an array of time-consuming education requirements" to "ensure that employees of certain businesses and building facilities are capable of serving certain protective and investigative functions in the event of a plethora of events that imperil the health and safety of such facilities' occupants." *Id.* at 819.[7]

---

[7] The Supreme Court summarized the SSBA's training requirements as follows: "Under the SSBA, within 180 days of its enactment for current employees, and within sixty days of hiring for new employees thereafter, covered security officers must receive a minimum of forty hours of training and annual refreshers of at least eight hours" on an array of security-related topics. *Pa. Rest.*, 211 A.3d at 833 (footnote omitted). Moreover, "[e]mployers are required by the SSBA to provide fifteen initial hours of training and a refresher course of unspecified duration on a triannual basis to building service employees in the subjects specified" in the SSBA. *Id.* at 833-34 (footnote omitted). Finally, the SSBA "imposes certification requirements for training schools and instructors, to be overseen by the [City's] Fire Bureau, which is responsible for the implementation and enforcement of the SSBA." *Id.* at 834.

13

Finally, the Supreme Court found an insufficient nexus between Sections 7501(a)[8] and 7503[9] of the Emergency Code and the SSBA's extensive training and education requirements. *Id.* at 836-37. The Court explained that although the Emergency Code references training programs, "in context it is difficult to conclude that the legislature intended this as an express grant of authority to impose *any training programs upon any private employers and any private employees that a municipality can tenuously connect to disaster preparedness*." *Id.* at 836 (emphasis added). Moreover, after reviewing the obligation in Section 7503 of the Emergency Code to "[e]stablish, equip and staff an emergency operations center," the Court determined that "*[n]othing about this statutory language suggests that it can support imposing broad obligations upon virtually all private building staff*, from security to custodial." *Id.* at 836-37 (emphasis added).

At the conclusion of the Opinion, the Supreme Court summarized its holdings as follows:

> What constitutes an express grant of authority to "determine duties, responsibilities or requirements placed upon businesses,

---

[8] Section 7501(a) of the Emergency Code provides that "[e]ach political subdivision of this Commonwealth is directed and authorized to establish a local emergency management organization," which "shall have responsibility for emergency management, response and recovery within the territorial limits of the political subdivision . . . and, in addition, shall conduct such services outside of its jurisdictional limits." 35 Pa. C.S. § 7501(a).

[9] Section 7503 of the Emergency Code requires each political subdivision to adopt an "[i]ntergovernmental [c]ooperation agreement" with other political subdivisions. 35 Pa. C.S. § 7503. Section 7503 further requires cooperating political subdivisions to, *inter alia*, maintain emergency management plans "for the prevention and minimization of injury and damage caused by disaster, prompt and effective response to disaster and disaster emergency relief and recovery," "[e]stablish, equip, and staff an emergency operations center," "provide individual and organizational training programs to insure prompt, efficient and effective disaster emergency services," and "[a]dopt and implement precautionary measures to mitigate the anticipated effects of disaster." 35 Pa. C.S. § 7503(1)-(3), (5).

14

occupations and employers" is a vexing question. If we interpret the word "express" too stringently, virtually any incidental burden upon employers arising from a local ordinance will be barred. If we interpret it too broadly, we subvert the General Assembly's manifest intent to limit the burdens that a home-rule municipality can impose upon businesses. Thus, we must find a middle ground.

Even if this case does not pronounce the ever-elusive bright-line rule, it enables us to bracket the gray area between what is and is not allowed by the limitations upon business regulation imposed by the Business Exclusion. *While the PSDA certainly burdens [City] employers, it clearly falls within the ambit of the City's express statutory authority to legislate in furtherance of disease control and prevention.*

Conversely, the City fails to identify any statutory authority sufficient to sustain the SSBA. *While the training that the SSBA mandates may well have a salutary public effect in disaster management, the measure's multifarious provisions simply want for any statutory authority, express or otherwise.* For owners and operators of qualifying facilities, maintaining and securing those facilities is a major, if not principal, function, and the definitions of "security officer" and "building service employee," are sufficiently broad to capture, at least as to some properties, virtually every individual employed by the building's management. For the foregoing reasons, *we must conclude that no statutory provision cited by the City comes close to authorizing such requirements.*

*Id.* at 837-38 (internal citations omitted) (emphasis added). Therefore, the Supreme Court upheld the PSDA and struck down the SSBA.[10]

---

[10] Justice Wecht authored the Majority Opinion in *Pennsylvania Restaurant*. With regard to Part IV of the Opinion, containing the legal analysis of the PSDA and the SSBA, each subsection garnered majority support. Justice Wecht's disposition upholding the PSDA was joined by Justices Todd, Donohue, and Dougherty. Justice Wecht's disposition striking down the SSBA was joined by Chief Justice Saylor and Justices Baer, Todd, Donohue, and Mundy.

Chief Justice Saylor authored a Concurring and Dissenting Opinion, which was joined by Justices Baer and Mundy. Chief Justice Saylor stated that he would have struck down the PSDA

15

## 2. Application of the Exception to the Business Exclusion[11]

In the instant matter, the City contends that both the Second Class City Code and the PHRA provided express statutory authorization for its enactment of the Ordinance. Applying the principles set forth in *Pennsylvania Restaurant*, we will address each statute in turn.

### a. The Second Class City Code

The City first asserts that the Second Class City Code expressly authorized its enactment of the Ordinance by granting the City broad police powers over its residents. Specifically, Section 3 of the Second Class City Code authorizes the City

> *[t]o make all such ordinances, by-laws, rules and regulations, not inconsistent with the Constitution and laws of this Commonwealth, as may be expedient or necessary*, in addition to the special powers in this section granted, for the proper management, care and control of the city and its finances, and *the maintenance of the peace, good government and welfare of the [C]ity*, and its trade, commerce and manufactures . . . .

53 P.S. § 23158 (emphasis added). According to the City, this broad authority to exercise its police powers necessarily includes the power to enact laws that protect

---

as well as the SSBA. Justice Baer authored a separate Concurring and Dissenting Opinion, which was joined by Chief Justice Saylor and Justice Mundy. Justice Dougherty also authored a Concurring and Dissenting Opinion, stating that he would have upheld both the PSDA and the SSBA.

[11] As discussed in the Background section of this Opinion, *supra*, an *en banc* panel of this Court previously determined that the Ordinance at issue here places affirmative duties, responsibilities, and requirements on businesses in violation of the Business Exclusion. *Apartment Ass'n*, 205 A.3d at 425. Although the Supreme Court vacated our prior Order, its directive to reconsider our decision in light of *Pennsylvania Restaurant* does not abrogate our conclusion that the Ordinance places affirmative duties on businesses. In fact, for *Pennsylvania Restaurant*'s analysis to even apply, the Ordinance must place affirmative duties on businesses. *See* 53 Pa. C.S. § 2962(f). Consequently, the issue before this Court on remand, as the parties have outlined in their briefs, is limited to whether the City satisfied the "expressly authorized by statute[]" exception to the Business Exclusion.

16

its residents against all forms of discrimination, including source-of-income housing discrimination. We disagree.

In *Pennsylvania Restaurant*, the Supreme Court specifically addressed the issue of whether Section 3 of the Second Class City Code provided express authorization for the City's enactment of the SSBA, which required private building owners to provide disaster preparedness education and training to their employees. The Supreme Court rejected the City's argument that the general police powers in Section 3 provided the express authorization necessary to satisfy the exception to the Business Exclusion, as follows:

> While we have rejected the proposition that the "express authorization" precludes any generality whatsoever, *we certainly do not suggest that what amounts to a broad account of traditional police powers constitutes "express" authorization for purposes of the Business Exclusion exception.* Were we to do so, the exception would devour the rule quite completely. Section[] [3 of the Second Class City Code, 53 P.S. § 23158] amount[s] to *a general warrant to legislate in service of the general health and welfare, which lies within a home-rule municipality's powers absent any statutory prohibition.* Here, however, the Business Exclusion furnishes such a prohibition. Consequently, the City's resort to the [Second Class City Code] fails.

211 A.3d at 835 (emphasis added).

Based on the Supreme Court's reasoning in *Pennsylvania Restaurant,* we conclude that the City failed to demonstrate a direct nexus between Section 3 of the Second Class City Code and the Ordinance to satisfy the exception in the Business Exclusion. Nothing in Section 3 of the Second Class City Code permits the City to enact legislation requiring residential landlords to participate in an otherwise voluntary federal housing subsidy program. *See id.* (noting that although the education and "training that the SSBA mandates may well have a salutary public

17

effect in disaster management, the [SSBA's] multifarious provisions" encompassed "virtually every individual employed by [a] building's management," thereby imposing onerous obligations on building owners without express authorization in violation of the Business Exclusion).

The City cites *Hartman* in support of its contention that it was authorized to enact the Ordinance prohibiting source-of-income discrimination pursuant to its broad police powers to promote the general welfare of its residents. However, we conclude that its reliance on *Hartman* is misplaced. In *Hartman*, this Court held that the non-discrimination ordinance at issue did not violate the Business Exclusion of the Home Rule Law because it did not place affirmative duties or requirements on businesses or employers. *Hartman*, 880 A.2d at 746-47. Rather, the ordinance merely banned discrimination in employment, housing, and public accommodations against certain protected classes of people. *Id.*; *see Bldg. Owners*, 985 A.2d at 715 (recognizing that "[t]he ordinance in *Hartman* simply disallowed discrimination based upon sexual orientation and gender identity generally"). In *Hartman*, we concluded that the Business Exclusion did not apply because the ordinance did not place affirmative obligations on private businesses. Thus, we did not consider whether the municipality had express statutory authority to enact the ordinance, as we must do here.

The City also asserts that without the ability to carry out its police powers by enacting non-discrimination ordinances, a home rule municipality would have substantially less power than its non-home rule counterparts, which contravenes the purpose of home rule. However, the *Pennsylvania Restaurant* Court explained that "a home-rule municipality cannot, *except where specified clearly by statute or the municipality's own charter*, find itself vested with less power than a non-home-rule

18

counterpart." *Pa. Rest.*, 211 A.3d at 824 (emphasis added). In the instant case, as in *Pennsylvania Restaurant*, we conclude that "the Business Exclusion furnishes such a prohibition." *Id.* at 835.

For these reasons, we reject the City's contention that the grant of police powers in Section 3 of the Second Class City Code provides the express authorization necessary for the enactment of legislation that regulates private businesses, which this Ordinance does by requiring residential landlords to involuntarily submit to the requirements of the Section 8 Program.[12] Therefore, we conclude that the Second Class City Code alone does not provide the requisite statutory authority to satisfy the exception to the Business Exclusion.

### b. The PHRA

Next, the City contends that the PHRA expressly authorized its enactment of the Ordinance. Section 2(a) of the PHRA prohibits "[t]he denial of equal employment, *housing and public accommodation opportunities*" to persons "by reason of their race, color, familial status, religious creed, ancestry, age, sex, national origin, handicap or disability, use of guide or support animals because of the blindness, deafness or physical handicap of the user or because the user is a handler or trainer of support or guide animals." 43 P.S. § 952(a) (emphasis added).

---

[12] Our Court has recognized:

[A] law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. *Under the guise of protecting the public interests the legislature may not interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations.*

*Johnson v. Allegheny Intermediate Unit*, 59 A.3d 10, 21 (Pa. Cmwlth. 2012) (*en banc*) (quoting *Adler v. Montefiore Hosp. Ass'n*, 311 A.2d 634, 640-41 (Pa. 1973)) (emphasis added).

19

As express statutory authority for the source-of-income Ordinance, the City cites Section 12.1 of the PHRA, which provides, "The legislative body of a political subdivision may, by ordinance or resolution, authorize the establishment of membership in and support of a Local Human Relations Commission." 43 P.S. § 962.1.[13] The City also cites Section 12 of the PHRA, which provides in relevant part:

> (a) The provisions of [the PHRA] *shall be construed liberally for the accomplishment of the purposes thereof*, and any law inconsistent with any provisions hereof shall not apply.

> (b) . . . *[N]othing contained in [the PHRA] shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance*, municipal charter or of any law of this Commonwealth *relating to discrimination because of race, color, familial status, religious creed, ancestry, age, sex, national origin or handicap or disability[]* . . . .

43 P.S. § 962(a), (b) (emphasis added).

The City argues that the Ordinance at issue here, like the PHRA, is aimed at protecting residents against discrimination. The City claims that, by authorizing a municipality to establish its own human relations commission to combat discriminatory practices, *see* 43 P.S. § 962.1,[14] the General Assembly intended to preserve a local municipality's power to enact greater protections against discrimination in its own community.

The City analogizes the Ordinance in this case to the PSDA at issue in *Pennsylvania Restaurant*, which the Supreme Court upheld. In that case, the

---

[13] Added by the Act of January 24, 1966, P.L. (1965) 1523.

[14] In its brief, the City notes that it has its own Commission on Human Relations. City's Br. at 26 n.1.

Supreme Court explained that "[w]hile the PSDA certainly burdens [City] employers, it clearly falls within the ambit of the City's express statutory authority [under the DPCL] to legislate in furtherance of disease control and prevention." *Pa. Rest.*, 211 A.3d at 837. Likewise, the City argues that the Ordinance here imposes only "incidental" burdens on landlords and "clearly falls within the ambit of the City's express statutory authority [under the PHRA] to legislate to provide protections for its residents in the area of anti-discrimination." City's Br. at 29. We disagree.

Notably, while Section 2(a) of the PHRA prohibits housing discrimination against certain classes of people, *see* 43 P.S. § 952(a), it does not identify "source of income" as a protected class. The City added the source-of-income class to the Ordinance because it determined that: (1) 41% of City residents with housing vouchers return them unused due to their landlords' refusal to accept vouchers; (2) discrimination against voucher holders is often a pretext for discrimination based on race, national origin, and familial status; and (3) due to landlords' refusal to accept vouchers, voucher holders are limited to housing choices in high-poverty neighborhoods. *See* R.R. at 82a-83a.

According to the City, it is irrelevant that "source of income" is not an enumerated protected class in the PHRA. The City contends that it is permitted to add a protected class to the Ordinance as it deems necessary for the welfare of its residents. As the City points out in its brief, "[t]he City added sex in 1969, disability and age in 1980, sexual orientation in 1990, familial status in 1992, gender identity in 2014, and status as a survivor of domestic violence in 2016 to the list of prohibited bases of discrimination" in the Ordinance. City's Br. at 28.

21

The problem with the City's position, however, is that, unlike the addition of the above classes to the Ordinance, the addition of the "source-of-income" class does more than just ban housing discrimination based on source of income. By expressly defining "source of income" to include federal housing assistance, and specifically Section 8 Program vouchers, the Ordinance requires residential landlords to participate in the Section 8 Program, when previously their participation was wholly voluntary.

The Trial Court set forth the obligations imposed on landlords who participate in the Section 8 Program as follows:

> [Under the Ordinance, l]andlords will be forced to comply with the numerous and often burdensome requirements of the Section 8 [P]rogram. For example, they will have to use the Housing Authority's model lease and/or submit a preferred lease to the Housing Authority for pre[-]approval. That lease must include word[-]for[-]word provisions of the HUD Tenancy Addendum. They will be prohibited from including notice of termination waivers in leases and must accept a mandatory "cure period" of five days in advance of issuing a Notice to Quit. Landlords will be required to accept "reasonable rent" obligations as established by the Housing Authority and provide at least 60 days' notice of any change in rent amounts. They will have to obtain approval from the Housing Authority to raise a tenant's rent. Finally, landlords will be forced to agree to month-to-month leases subsequent to an initial one[-]year lease term.

Trial Ct. Op., 3/14/18, at 4-5 (unpaginated); *see also* R.R. at 80a, 89a-107a (outlining the requirements of the Section 8 Program Administrative Plan and applicable federal regulations).

In addition, a landlord participating in the Section 8 Program is required to enter into a Housing Assistance Payment (HAP) Contract with the Housing Authority, which is separate from the lease agreement between the landlord and his or her tenant. The HAP Contract also contains a tenancy addendum that sets forth

22

the duties and obligations of both the landlord and the tenant under the HAP Contract. *See* R.R. at 38a, 80a, 99a-100a, 106a. Given the nature and extent of the Section 8 Program requirements, we cannot conclude that mandating landlords' participation in the Section 8 Program is merely an "incidental" burden, as the City suggests.

Nor do we find express authorization for the imposition of these requirements in the PHRA. The Ordinance here is more akin to the SSBA at issue in *Pennsylvania Restaurant*, which the Supreme Court struck down under the Business Exclusion. The Court determined that Section 2962(4) of the Home Rule Law – which gives home rule municipalities the power to enact building codes and safety regulations – did not authorize the City to enact an ordinance imposing extensive safety education and training obligations on private building owners in furtherance of disaster preparedness. *Pa. Rest.*, 211 A.3d at 835. The Court explained that Section 2962(c)(4) pertains principally to building codes, which is "a far cry from authorizing staff education and training requirements in subjects with little or no connection to building codes generally." *Id.* The Court also rejected the City's reliance on the provisions of the Emergency Code relating to safety training, finding that "it is difficult to conclude that the legislature intended this [provision] as an express grant of authority to impose any training programs upon any private employers and any private employees that a municipality can tenuously connect to disaster preparedness." *Id.* at 836. In striking down the SSBA, the Supreme Court found that the shared policy objective between the SSBA and the Emergency Code was insufficient to justify the City's imposition of affirmative duties on private businesses to further that objective. *Id.*

23

Similarly, while the PHRA is aimed at protecting citizens from discrimination, the Ordinance here goes far beyond that aim. By expressly including federal housing subsidies in the definition of "source of income," the Ordinance mandates that residential landlords in the City participate in the Section 8 Program and comply with its numerous, and often burdensome, regulations. *See* Trial Ct. Op., 3/14/18, at 4 (unpaginated). Just as the Supreme Court in *Pennsylvania Restaurant* determined that the City cannot require private building owners to educate and train their employees in emergency management for the purpose of disaster preparedness, *see Pa. Rest.*, 211 A.3d at 835-37, the City also cannot compel private landlords to participate in a *voluntary* federal housing subsidy program. *See Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (recognizing that "[l]andlord participation in the [Section 8] voucher program is voluntary" under federal law); *see also Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 300 (2d Cir. 1998) ("[T]he voluntariness provision of Section 8 reflects a congressional intent that the burdens of Section 8 participation are substantial enough that participation should not be forced on landlords, either as an accommodation to handicap or otherwise."). We agree with Apartment Association that the Ordinance here "exemplifies the very essence of the invasive regulations that [the Business Exclusion] is designed to prevent, and strictly prohibits." *Bldg. Owners*, 985 A.2d at 715-16.[15]

---

[15] The City also asserts that several municipalities across the Commonwealth and the United States have enacted similar legislation prohibiting source-of-income discrimination, thereby demonstrating the validity of this Ordinance. *See* City's Br. at 30-32. In particular, the City points to a similar ordinance enacted by the Borough of State College, Pennsylvania, another home rule municipality. According to the City, the State College ordinance makes it an unlawful housing practice to discriminate against individuals based on "source of income." *See* City's Reply Br. at 18-19. However, the City does not include in its discussion how the State College ordinance

We conclude that the PHRA does not provide express statutory authority for the City's enactment of the Ordinance.

## Conclusion

In sum, applying the Supreme Court's reasoning in *Pennsylvania Restaurant* to the source-of-income Ordinance, we conclude that the City has failed to satisfy the exception to the Business Exclusion of the Home Rule Law. There is an insufficient nexus between the cited provision of the Second Class City Code or the cited provisions of the PHRA and the Ordinance's mandate that all residential landlords in the City participate in the federal Section 8 Program.

The requirements imposed on residential landlords by the source-of-income Ordinance are similar in scope to those imposed on private building owners by the SSBA in *Pennsylvania Restaurant*. The SSBA's provisions applied to *all* large-scale commercial office buildings, retail buildings, hospitals, museums, colleges, and universities in the City. *Pa. Rest.*, 211 A.3d at 818. The SBBA mandated that the owners of such properties provide 40 hours of safety and disaster preparedness training, followed by annual 8-hour refresher courses, to their security officers. *Id.* at 833. Property owners were also required to provide 15 hours of initial training, followed by tri-annual refresher courses, to their building service employees. *Id.* Further, the SSBA mandated that all safety training instructors obtain numerous certifications, regulated and overseen by the City's Fire Bureau. *Id.*

---

defines "source of income," nor does the City indicate whether the State College ordinance expressly includes federal housing subsidies or Section 8 Program vouchers in its definition of "source of income." The State College ordinance is also not included in the record on appeal. In any event, the fact that another home rule municipality has enacted a source-of-income ordinance is irrelevant to our inquiry here, as there is no indication in the record that the State College ordinance has ever been challenged in, or reviewed by, any court under the Business Exclusion of the Home Rule Law.

In striking down the SSBA under the Business Exclusion, the Supreme Court determined that the Emergency Code did not provide the City express "authority to impose any training programs upon any private employers and any private employees that [the City could] tenuously connect to disaster preparedness." *Id.* at 836. The Court further found nothing in the Emergency Code to "support imposing broad obligations upon virtually all private building staff" in the City. *Id.* at 836-37. The Court held that the shared policy objective between the SSBA and the Emergency Code did not justify the City's imposition of affirmative duties on private businesses to further that objective. *Id.* at 836.

Likewise, the Ordinance here broadly encompasses *all* property owners who operate residential rental businesses in the City. By defining "source of income" to include federal housing assistance and Section 8 Program vouchers, the Ordinance goes far beyond its intended objective of protecting City residents from housing discrimination. The City has now made a voluntary federal program mandatory for all residential landlords in the City. As a consequence, those landlords will be required to enter into contracts with the Housing Authority, accept rental payments from the Housing Authority, and comply with the numerous terms and conditions applicable to Section 8 Program participants prescribed by the federal government. As in *Pennsylvania Restaurant*, we conclude that "no statutory provision cited by the City comes close to authorizing such requirements." *Id.* at 838. While the City's enactment of the Ordinance was undoubtedly well intended, we find that the Ordinance places more than mere "incidental or *de minimis*" burdens on private businesses in violation of the Business Exclusion. *Id.* at 832; *see Salute*, 136 F.3d at 301 ("[T]he burden of participating in the Section 8 [P]rogram cannot be viewed

26

as imposing only reasonable costs or insubstantial burdens, if only because Congress decided this issue by making participation voluntary.").

Accordingly, because we conclude that the City has not established express statutory authority to enact the source-of-income Ordinance pursuant to *Pennsylvania Restaurant*, we affirm the Trial Court's Order.

_____
ELLEN CEISLER, Judge

27

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Apartment Association of Metropolitan : 
Pittsburgh, Inc. : 
 : 
      v. :   No. 528 C.D. 2018
 : 
The City of Pittsburgh, : 
                Appellant : 

# **O R D E R**

AND NOW, this 12th day of March, 2020, the Order of the Court of Common Pleas of Allegheny County, entered March 14, 2018, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge